# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| | : | |
| v. | : | CRIMINAL CASE NUMBER: |
| | : | 1:16-CR-00323-2-LMM-JSA |
| HONORATO PINEDA-ZUNIGA | : | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Honorato Pineda-Zuniga was a passenger in a Cadillac CTS that was stopped on pretextual grounds by the Georgia State Patrol on June 25, 2015. The true reason for the law enforcement stop was that the car was suspected of being involved in an international narcotics trafficking and money laundering operation that was the subject of an ongoing wiretap investigation. Defendant now moves to suppress the evidence resulting from this vehicle stop, alleging that the police lacked reasonable suspicion to initiate the seizure. Because the evidence introduced at the evidentiary hearing shows that the authorities had adequate grounds to stop the car, however, the Court **RECOMMENDS** that the Motions to Suppress [84][86] be **DENIED**.

## FACTS

In February 2015, the U.S. Drug Enforcement Administration ("DEA") initiated a wiretap investigation into a suspected narcotics trafficking organization

involving a Mexican-based individual known as Jose Pineda-Arzate, a/k/a Guaguanco. Transcript of June 14, 2017, Evidentiary Hearing [109] ("Tr.") at 8, 10-11. In early May, 2015, agents began intercepting a series of text communications between Pineda-Arzate and another individual who they believed to be Alexis Ayala-Pineda, a/k/a El Primo, who had been observed in a surveillance operation approximately one month earlier frequenting a location where approximately ten kilograms of heroin was later seized. Tr. at 11-12. The subject matter of these communications appeared to be, among other things, Ayala-Pineda's efforts to rent a house in the Atlanta area. For example, on May 11, 2015, Ayala-Pineda advised Pineda-Arzate that "I am going to need '33' because I might get the house tomorrow. . . Tomorrow I have an appointment with the old lady at 10:00."[1] Tr. at 11-12, Gov't Ex. 1. DEA Task Force Officer David Noe, the

---

[1] This and all other English quotations represent the contemporaneous translation provided by DEA personnel who were listening to the intercepts and documenting the calls via linesheets, which linesheets (Spanish and contemporaneous translations) are introduced into evidence as Gov't Exs. 1-4.

Defendant in his reply brief argued, "Though the subject messages were in Spanish and interpreted by professionals, [DEA Task Force Officer David] Noe [the testifying case agent] ignored the interpreter's version of what the messages contained and merely relied upon his own version of what he 'thought' was being said. This, despite the fact he does not speak Spanish." Def. Reply [114] at 2. This argument and the incomplete and out-of-context citations cobbled together in support are extremely misleading. Directly contradicting Defendant's argument–but what Defendant omits from his citations–is that Noe clearly and unequivocally testified, after acknowledging that he is not fluent in Spanish, that he *was relying* on the contemporaneous translations provided by the DEA Spanish

Government's case agent, testified based on the information learned from the intercepts as a whole in the investigation, that "33" was likely a code word for money. Tr. at 23. Ayala-Pineda three days later then texted Pineda-Arzate a screen shot of a real estate listing, which referred to a residence at 3088 Janice Circle, Chamblee, Georgia. *See* Gov't Ex. 1.

Several weeks earlier, the agents had already identified another residence in the Atlanta area believed to be used by this drug trafficking organization, within the apartment complex at 1750 Briarwood Road in Brookhaven. In April 2015, the agents learned information that Ayala-Pineda and Defendant Honorato Pineda-Zuniga, who were staying at a Windham Hotel in Sandy Springs, were to pick up a shipment of methamphetamine hidden in a van with a trap compartment. Tr. at 13-14. As part of their efforts to conduct surveillance on these suspects, the agents

---

interpreters. Tr. at 9. Defendant does not cite that statement, but instead cobbles in a reference to a snippet of testimony 12-13 pages later, on a different subject. At that juncture, the prosecutor asked Noe about certain parenthetical terms that appeared in the linesheet translations. Noe explained that it was the practice of the bilingual DEA personnel listing to the intercepts to not just contemporaneously record and translate what was being said, but to also add their own impressions in the form of parentheticals as to what certain code words might be referring to. *See* Tr. at 21-22. In that regard, the prosecutor asked Noe, and Noe confirmed, that in interpreting the meaning of phrases and code words in the context of this investigation, he was relying on his own greater knowledge and experience and not the impressions of the DEA translators. *Id.* In no way shape or form did Agent Noe suggest that he was not relying on the actual Spanish-to-English language translation services of the bilingual DEA personnel, and to the contrary he clearly stated that he was.

obtained a warrant authorizing them to place a GPS tracking device on a Pontiac Aztek car that they believed the suspects were driving. *Id.* at 14-15. The agents discovered this car parked in the apartment parking lot at 1750 Briarwood Road, which is how the investigators initially became aware of this address. *Id.* at 14. Between April and late June 2015, the investigators conducted various surveillance from time to time at the two locations (Briarwood Road and Janice Road). *Id*. at 31. At least two common vehicles, including the black Cadillac that was ultimately the subject of the traffic stop at issue in this motion, were seen on multiple occasions at the two locations. *See id*. at 30-31.

Specifically with regard to the Janice Road location, the agents intercepted a series of texts suggesting that the occupants of that house were observing law enforcement surveillance around the house, and reporting concerns to and asking for guidance from Pineda-Arzate. *See* Tr. at 21-22, Ex. 2. In a text on June 10, 2015, for example, an individual identified as "JR#1Gold" (later identified as or believed to be Defendant Honorato Pineda-Zuniga),stated "Hey! Shit just got heated up. . . There is a Suburban going around the house." Gov't Ex. 2. Officer Noe confirmed that the investigators were, in fact, conducting surveillance that night at the Janice Road, and were using a Suburban along with other similar vehicles. *Id.* at 18-19.

There was no immediate response from Pineda-Arzate. Shortly afterwards,

however, another individual (identified as "Cachorro"), texted Pineda-Arzate to say "Listen, Norato [believed to refer to Defendant Honorato Pineda-Zuniga] says for you to send him a message, that it is urgent." *Id.* at 19-20; Gov't Ex. 2. Approximately 10 minutes later, Pineda-Arzate (a/k/a Guanguanco) texted Defendant (using the alias "Jr#1Gold"), asking "did you pick up something?," to which Defendant responded, "yes . . . he told me 10." Pineda-Arzate responded, "But do you have them buried or how is the deal?" Tr. at 20-21; Gov't Ex. 2.

Approximately 10 minutes later, Defendant asked "what should we do? Should we leave from here?" Tr. at 23; Gov't Ex. 2. Pineda-Arzate asked, "is it far from the other office," presumably referring in code to the other house being used by the organization in Atlanta (presumably, Briarwood Road), to which Defendant responded, "yes, a bit." *Id.* Pineda-Arzate asked, "how much 33 [again, believed by the investigators to be a code word for money] is there?" to which Defendant responded "I have 15." *Id.* Pineda-Arzate asked "do you think this [presumably referring to the sureillance] is for the stuff now or do you believe they already had [a tail] on them?" *Id.* After Defendant stated that he did not know, and that "everything was cool," Pineda-Arzate advised him "leave since you do not know . . . and tomorrow we will see what is up." *Id.*

Approximately 15 or so minutes later (around 1:00 am on June 11, 2015), Defendant noted that "if it [presumably referring to the surveillance] was not for

the stuff now, it was for the 10, from '33' a while back." Tr. at 24-26; Gov't Ex. 2. Pineda-Arzate asked, "who picked them up, you or the guy," to which Defendant responded "I." Pineda-Arzate asked "did you arrive at the other office [presumably referring to Briarwood Road]," and Defendant confirmed that he had. Tr. at 24-26; Gov't Ex. 2. Officer Noe indicated that he concluded from the context of these and other communications that the references to having picked up "10" was a reference to acquiring 10 units of some amount of narcotics. Tr. at 25. For example, Officer Noe testified that an earlier transcript referred to picking up "10" units from someone to whom they were giving "25,000," which Officer Noe explained was likely a reference to a narcotics-for-money transaction. *Id.* at 25. In general, based on these and other intercepts, the agents concluded that the Janice Road location was likely used to store money and as a residence for the conspirators and the Briarwood Road apartment was likely used as a stash house for drugs. *Id.* at 25-26.

The Government introduced a series of linesheets, as Exhibit 3, that Officer Noe explained reflected discussion of processing of methamphetamine, which apparently was not going well. Tr. at 28-31. On June 14, 2015, Defendant (using the alias Jr#1Gold) stated to Pineda-Arzate, "Only one passes, the rest are like sand," and that they were told, presumably by a customer, that "they do not work." Gov't Ex. 3. Pineda-Arzate stated "give them to other people," to which

Defendant suggested "let me put one into a bath and see if they work like that." Tr. at 28-29; Gov't Ex. 3.

Other subsequent texts included continued references to:

- "cops," "I have seen a lot of movement [apparently law enforcement related] this month," to which Pineda-Arzate stated "be careful";

- an apparent transaction involving "the guy for the 5," for which Defendant asked, "Do I give him 5 of the bad ones?";

- questions about the same or a different transaction, "in the end, do I just leave them with him... or is he going to give me the '33'?" And, "hey, he only wanted one . . . not 5 of them," and that "they were like sand . . . and he only needed one."

- other customers that "did not want anything . . . because they were like sand."

- complaints that the product "do not stretch," that "I put in the 10 together to see if 5 good quality ones came out but they did not want to," so "I left more water in to see if they stretched."

Gov't Ex. 3.

Officer Noe explained that, given his experience with investigating narcotics cases, that these and other texts reflected:

> that they kept thinking the drugs weren't stretching well, they weren't

> processing right, people were returning the drugs because they didn't like it, so there were a lot of intercepts between Honorato and José or Guaguanco indicating that they didn't like the looks of it, they didn't like the texture or it wasn't coming out properly, so a lot of people were returning the drugs.

Tr. at 28. Officer Noe also explained his understanding of what Defendant likely was referring to by a "bath":

> I believe that's part of the process, that they can put the methamphetamine into a solution, either with some water or with some paint thinner and reprocess it and maybe stretch it back out or create the crystals where the meth looks better.

Tr. at 29. Officer Noe explained that he believed the narcotics-processing activities (including the "stretching" or "bath") was occurring at the Briarwood Road location instead of the Janice Road location, but he did not specifically explain why. *See* Tr. at 27-28.

Officer Noe also introduced Gov't Ex. 4, which included a number of linesheets referencing apparent wire transfers in mid to late June. Tr. at 32-35; Gov't Ex. 4. Ultimately, the agents staked out the Briarwood Road location on June 24 and 25, with an eye towards make a stop or arrest. *Id*. at 36-38. On June 25, 2015, a subject (later identified as Defendant Hector Molina) arrived at Briarwood Road in a blue Ford Explorer that had been observed on several previous occasions. Tr. at 38-39. The subject entered the apartment complex, and came out approximately 10 minutes later with a small cooler-type bag, and drove

off in the Explorer.  *Id.*  The black Cadillac that has also been observed at both locations in the past followed the Explorer out of the parking lot.  *Id.*  The Explorer stopped at a gas station, and the Cadillac apparently continued on.  *Id.*  At the gas station, Trooper Jason Kent of the Georgia State Patrol pulled over the Explorer at the instruction of DEA.  *Id*. at 40.  Trooper Kent conducted a search of the Explorer–which is not the subject of this motion to suppress–and discovered four kilograms of apparent methamphetamine in what appeared to be the same bag that the subject had taken from the apartment.  *Id.* at 40-41.

Meanwhile, other agents conducting surveillance at Janice Road saw the black Cadillac (which had been following the Explorer from Briarwood but which continued on after the Explorer stopped at the gas station) arrive there.  *Id*. at 41.  The agents saw the Cadillac being "loaded up" with luggage.  *Id.*  Officer Noe arrived on the scene after other agents had observed the suspects loading up the Cadillac with bags.  *Id.*  But Officer Noe, in subsequently following the Cadillac, stated that he "could see, just faintly, bags stacked up almost to the ceiling of the Cadillac from where I was sitting."  *Id.* at 42.  The investigators thus believed, "based on them loading the Cadillac up with all of the bags, that they were cleaning the stash house out."  *Id.*  In other words, the investigators believed that all or much of the evidence that they otherwise believed would be found within the Janice Road house was now being transported away in the car.  *Id*. at 43-44.  Thus,

Officer Noe directed Trooper Kent to pull over the Cadillac, just as he had done with the Explorer. *Id.*

Trooper Kent pulled over the car. Tr. at 74. In addition to the information from the DEA, indicating that the Cadillac was suspected of involvement in a drug trafficking and money laundering operation, Trooper Kent testified that as he pulled behind the car he concluded that the Cadillac had illegal window tint on the back window. *See* Tr. at 84-85. According to Trooper Kent, "[a]ll the windows looked extremely dark. Like I said, the back window, it was completely blacked out. I could not see any silhouettes or any movement inside the car or anything like that; and the side windows, they looked very dark as well." Tr. at 85. However, Trooper Kent was unable to verify whether the back window was in compliance with legal standards or not, because he did not have the appropriate device with him to offer a precise measurement. *Id.* at 94. Trooper Kent was able to measure the side windows, which were within legal limits. *Id.*

The Defendant was one of two passengers in the car, along with a driver. During an investigative detention, the Trooper brought all three occupants out of the vehicle and had the occupants identify each of their belongings in three separate piles. Tr. at 86-87. During this process, Trooper Kent found a handgun in the car. Tr. at 87, 107. Approximately 30 minutes into the stop, Trooper Kent conducted a K-9 sniff with a trained narcotics sniffing dog, who gave positive

alerts (indicating the presence of narcotics) to a door seam in the car as well as to the three piles of belongings of the occupants. *See* Tr. 90-92, 102-103, 123-125. Eventually, the Defendant and the driver were arrested, apparently on unrelated state charges. The third occupant was released. As part of Defendant's arrest, a search incident to arrest was performed and inside his pockets were found several receipts and keys to the suspected stash house apartment at Briarwood Road. Tr. at 26-27, 35-37, 47-48, 58-61.[2]

## DISCUSSION

Defendant argues that Trooper Kent lacked a justifiable basis to pull over the Cadillac, and that all evidence subsequently obtained as a result of this traffic stop should be suppressed. In order to at least briefly stop a vehicle, an officer must have reasonable and articulable suspicion that the occupants are engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Sharpe*, 470

---

[2] The Court offers only a very condensed summary of the events that occurred after the stop itself, because the Defendant's suppression argument is limited to whether the traffic stop was justified. In other words, the Defendant does not present any arguments for suppression based on any other alleged constitutional violations after the stop itself. *See* Def. Br. [110] ("*Issue.* The issue before the court is whether Trooper Kent's stop of the Cadillac was a constitutionally permissible intrusion into [Defendant Pineda-Zuniga's] Fourth Amendment protections.") Indeed, the Government argues, and the Defendant does not refute, that as a mere occupant of the car, Defendant would not have standing to challenge the search of the car, except as it resulted from the alleged illegal traffic stop. Thus, the Court offers these subsequent facts, including as to the K-9 search, simply for context.

U. S. 675 (1985). To make a showing that in fact the officers had reasonable suspicion, they "must be able to articulate more than an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity.'" *Illinois v. Wardlow*, 528 U.S. 119, 123-4 (2000) (quoting *Terry*, 392 U.S. at 27). However, the "officer's motive in making the traffic stop does not invalidate what is otherwise 'objectively justifiable behavior under the Fourth Amendment[.]'" *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999) (quoting *Whren v. United States*, 517 U.S. 806, 812 (1996)).

Probable cause is not required to justify an investigative stop; reasonable suspicion is sufficient. *United States v. Powell*, 222 F.3d 913, 917-8 (11th Cir. 2000); *United States v. Mikell*, 102 F.3d 470, 474-5 (11th Cir. 1996).[3] In deciding whether there is reasonable suspicion, the Court is to consider the collective knowledge of all law enforcement officers working together, to the extent they maintained at least a minimal level of communication during their investigation. *See United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985).

---

[3] If the scope of a traffic stop exceeds that of an investigative stop, it constitutes an unreasonable seizure unless it is supported by probable cause. *See United States v. House*, 684 F.3d 1173, 1199 (11th 2012). Defendant, however, does not make this argument here nor is there any suggestion to the Court that the duration of the detention was unreasonable given the circumstances, including Trooper Kent's investigation into whether warrants might exist as to two of the occupants, and his relatively quick discovery of a firearm inside the car. Nor can the Court conclude that the officers lacked probable cause, especially once the K-9 provided its positive alerts.

Here, Trooper Kent was working with and acting at the direction of Officer Noe and the rest of the DEA team. Therefore, the Court considers the information known to the investigation team as a whole as of the time of the stop. Considering that information, the Court easily concludes that Trooper Kent's traffic stop was justified on the basis of reasonable suspicion.

As explained above, this traffic stop occurred after several weeks of surveillance and wiretap interceptions that strongly indicated the presence of a drug trafficking and money laundering operation at the Janice Road and Brookhaven Road locations. The interceptions indicating, among other things, that the suspects were "bathing" and "stretching" product–which Officer Noe explained is a common reference to processing techniques relating to methamphetamine–and were reacting to apparent dissatisfaction by customers with the product because of its texture, "like sand." The interceptions included references to wire transfers, pickups and storage of money (referred to by code, "33"), and repeated, clear expressions of concern about police surveillance. Shortly before the traffic stop, the Cadillac was seen leaving the premises of one suspected stash house (Briarwood Road), along with another vehicle, that was stopped with four kilograms of apparent methamphetamine inside. And immediately before the stop, the Cadillac was seen at the second suspected stash house (which the suspects in their texts referred to as their second "office"), being "loaded up" with baggage.

These observations were hardly vague and inchoate. To the contrary, these facts provided a specific, concrete, and quite strong basis to conclude that criminal activity was afoot, and that the Cadillac was transporting evidence. The stop was justified at least by reasonable suspicion. *See United States v. Lindsey*, 482 F.3d 1285 (11th Cir. 2007) (reasonable suspicion established where police received tip that four men were loading weapons into a SUV at a particular location and where police knew armed robberies had occurred in that general area by men driving a SUV); *United States v. Nunez*, 455 F.3d 1223 (11th Cir. 2006) (reasonable suspicion based on fact that defendant was seen entering a house known to contain a marijuana growing operation, and then left with a garbage bag); *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000) (reasonable suspicion established where defendant was found standing near a parked car, at night, in an area known for drug trafficking and violence, upon seeing approaching officers, quickly moved toward defendant's vehicle).[4]

---

[4] The Government also argues, in the alternative, that Trooper Kent was independently justified in pulling over the Cadillac on the basis of the perceived window tint violation. After all, even a pre-textual traffic stop–triggered by something other than the officer's true reason for stopping the car–is permissible if there was sufficient indication of an actual traffic violation to support the pre-textual basis for the stop. *See Whren*, 517 U.S. at 806. The facts regarding the window tint violation are somewhat more unclear, however. On the one hand, Trooper Kent stated that "the back window, it was completely blacked out. I could not see any silhouettes or any movement inside the car or anything like that." Tr. at 85. On the other hand, Officer Noe testified that while he was following the Cadillac, he "could see, just faintly, bags stacked up almost to the ceiling of the

## CONCLUSION

Thus, Defendant's Motions to Suppress [84][86] should be **DENIED**. This matter is now **READY FOR TRIAL**.

**IT IS SO RECOMMENDED** this 18th day of August, 2017.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE

---

Cadillac from where I was sitting." *Id.* at 42. These statements may be inconsistent, or may simply represent a different perception, vantage point, lighting, or that one witness has better eyesight than the other. In any event, where it is the Government's burden to prove reasonable suspicion, and where no other corroborating evidence was introduced to show the extent of any tinting in the back window, the Court finds it difficult to make any particular findings on this topic. Doing so is unnecessary, however, because the facts as outlined above demonstrate more than a sufficient basis to establish the legality of the stop.

To the extent Defendant argues that Officer Noe's testimony "should be rejected in its entirety" because of the possible conflict between Officer Noe's observation of the back window and Trooper Kent's, the Court rejects that inference. As explained above, these statements are not necessarily contradictory, and certainly the Court cannot make any findings that Officer Noe in particular testified inaccurately or falsely. In the end, where even Noe could only see something "just faintly," and where the officers otherwise possessed strong evidence of drug trafficking and money laundering activity, this is at most a small issue that does not warrant discrediting any witness's testimony.